STATE of Wisconsin, Plaintiff-Appellant,

v.

Terri WILLIQUETTE, Defendant-Respondent-
Petitioner.

Supreme Court

*No. 84–2046–CR. Argued February 11, 1986.—Decided April
16, 1986.*

(Also reported in 385 N.W.2d 145.)

241

For the defendant-respondent-petitioner there was a brief and oral argument by *Thomas S. Reynolds,* Sturgeon Bay.

For the plaintiff-appellant the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

STEINMETZ, J.   The issue in the case is whether a parent who allegedly knew her husband had repeatedly abused her two children both physically and sexually, but who took no action to stop the abuse and instead left the children in the father's sole physical custody for hours at a time, can be tried for the direct commission of the crime of child abuse under sec. 940.201, Stats.[1] We conclude that a parent who knowingly permits another person to abuse the parent's own child subjects the child to abuse within the meaning

---

[1] Section 940.201, Stats., provides as follows:

" **940.201    Abuse of children.** Whoever tortures a child or subjects a child to cruel maltreatment, including, but not limited, to severe bruising, lacerations, fractured bones, burns, internal injuries or any injury constituting great bodily harm under s. 939.22(14) is guilty of a Class E felony. In this section, 'child' means a person under 16 years of age."

of sec. 940.201. We therefore affirm the court of appeals' decision.[2]

In a criminal complaint issued on November 15, 1983, Terri Williquette, the defendant, was charged with two counts of child abuse, contrary to sec. 940.201, Stats. Count one was based on the defendant's alleged failure to take any action to prevent her husband, Bert Williquette, from repeatedly "sexually abusing, beating, and otherwise mistreating" her seven year old son, B.W. Count two was based on the defendant's alleged failure to take any action to prevent her husband from committing similar acts against the defendant's eight year old daughter, C.P.

The complaint was based on information supplied by Sergeant Bies of the Door county sheriff's department. The sergeant obtained his information from conversations with the children, B.W. and C.P., Dr. Ferrin Holmes, Bert Williquette and the defendant, as well as from his review of a conversation B.W. had had with a social worker.

According to the complaint, B.W. stated that on November 10, 1983, he had been beaten with a metal stick on his right foot, ankle and left thigh by his father, Bert Williquette. B.W. also stated he had been beaten by his father on many occasions in the past and that all the bruises visible on his body were the result of being beaten with a metal stick.

The complaint further stated that B.W. reported being forced by his father to stand on one foot and one hand in an unbalanced position. In that position, his

[2] The court of appeals held that the defendant could only be tried as an aider and abettor of child abuse. We conclude that she can be prosecuted as a direct principal. Accordingly, we do not reach the aiding and abetting issue.

father would strike him. B.W. also indicated that on several occasions Bert Williquette had stuck his "bug" up B.W.'s "butt" and in his mouth. B.W. pointed to the penis on an anatomically correct drawing of an unclothed boy when asked what "bug" meant.

B.W. stated that he had told his mother on many occasions that he had been beaten with the metal stick by Bert Williquette, but the defendant never did anything about it. He also reported telling his mother about the incident on November 10, 1983, when he had been struck on the foot with the metal stick. At that time, his mother told him "not to worry about it."

According to the complaint, Dr. Ferrin Holmes, a pediatrician at the Door County Medical Center, examined B.W. on November 11, 1983, and observed numerous bruises on the child's feet, upper and lower legs, lower and upper back, left arm and the side of his chest. Dr. Holmes stated that, in his professional opinion, B.W. had been beaten on at least four separate occasions in the fairly recent past, and that the beatings were inflicted with a metal stick or instrument.

The complaint also describes a conversation that Sergeant Bies had with C.P., defendant's daughter, on November 14, 1983. C.P. stated that Bert Williquette regularly beat her and her brother at their home in Door county, on occasion using a metal stick with a hook on its end. C.P. stated that Bert Williquette would beat her and B.W. so hard that the children would wet their pants. He allegedly would also make the children balance on one hand and one leg, and then he would take the hook end of the metal stick and trip them, causing them to fall down. C.P. told Sergeant Bies that some time after Halloween in 1983, Bert Williquette hit her on the top of the head with the metal stick so

hard that she bled. Sergeant Bies examined the area of C.P.'s head where she claimed Bert Williquette had struck her, and he could still feel a lump there. C.P. indicated that she had told the defendant about the incident, and that the defendant had given her an ice pack for her head.

C.P. also stated that in the summer of 1983, when she went swimming in her bathing suit, Bert Williquette would put lotion from a yellow bottle on his "wienie" and would then put his "wienie" in her and B.W.'s "butts." C.P. also pointed to the penis on an anatomically correct drawing of an unclothed boy when asked what she meant by "wienie." C.P. further indicated that on occasion "white stuff" would come out of Bert Williquette's "wiener" when he stuck it in the children's mouths, and when this happened, Williquette would make them swallow the "white stuff." If they refused to do so, Bert Williquette would hit them.

Both B.W. and C.P. also indicated that Bert Williquette would frequently take either a spoon or a cup, go inside the toilet bowl to remove some "poopy," and make the children eat it. If they refused to swallow it, Bert Williquette would strike them.

C.P. said that she had told the defendant about all of the sexual abuse incidents involving her and B.W. but that her mother did not do anything about it. She also indicated to a social worker that she had told her mother on many occasions about the times she and B.W. were beaten by Bert Williquette. Her mother allegedly told C.P. that she would do something about it, but she never did.

A joint preliminary hearing subsequently was held to consider the charges against the defendant and Bert Williquette. B.W., C.P., Dr. Holmes, Sergeant Bies

and Allyn Buehler of the Door county sheriff's department testified at the preliminary.

C.P. was either unable or unwilling to answer many of the questions that the district attorney asked her at the preliminary. However, on cross-examination by the defendant's attorney, C.P. testified that she had told the defendant about her dad "putting his wiener up [my] butt" before her dad was put in jail, and that she told her mother about this "many times" a long time ago.

Sergeant Bies testified that C.P. had told him that she informed her mother about "everything" including the abuse inflicted by her father every time it happened. Despite telling her mother, the incidents of abuse allegedly continued.

B.W. testified that he had told the defendant lots of times that his daddy made him eat "poop" and that his mother said "she would tell daddy but she didn't." B.W. also testified he had told his mother "lots" about his father beating him with the metal stick. On cross-examination by his father's attorney, B.W. said he had told no one but his mother about getting hit with the metal stick. On cross-examination by his mother's attorney, B.W. stated that the defendant was never around when his father abused him. She allegedly was at work.

At the close of the testimony, the trial court ordered the defendant bound over on the two counts of child abuse in violation of sec. 940.201, Stats.

On June 6, 1984, the defendant filed a motion to dismiss the information. She claimed that she could not be charged with child abuse because she did not directly commit the abusive conduct. The circuit court granted the motion to dismiss. The court concluded

that sec. 940.201, Stats., applies only to the intentional acts of a defendant who directly abuses a child. Accordingly, the mother's alleged failure to take any action to prevent her husband from abusing the children was not covered by the statute.

The state appealed the circuit court's decision to dismiss the charges against the defendant. The state agreed that the defendant did not actively participate in the sexual abuse or beating of her children. However, the state argued that the evidence at the preliminary hearing showed that the children had told the defendant on numerous occasions about the abuse and that she failed to take any action to prevent C.P. and B.W. from being subjected to further beatings and molestation. In fact, the defendant allegedly continued to leave the children in her husband's sole physical custody while she was at work. The state contended that the defendant's acts subjected the children to abuse within the meaning of sec. 940.201, Stats.

The court of appeals reversed the trial court's order of dismissal. The court of appeals reasoned that the defendant could have been bound over for aiding and abetting her husband's abuse of the children, even though the state had not proceeded on this theory. *State v. Williquette,* 125 Wis. 2d 86, 90–91, 370 N.W. 2d 282 (Ct. App. 1985). The court of appeals agreed with the trial court, however, that the defendant could not be tried for directly committing child abuse based on her alleged failure to protect her children.

The issue in this case involves statutory interpretation, which presents a question of law. This court reviews questions of law without deference to the reasoning of the circuit court or the court of appeals.

*Milwaukee Met. Sewerage Dist. v. DNR,* 126 Wis. 2d 63, 71, 375 N.W. 2d 649 (1985).

The parties disagree as to whether sec. 940.201, Stats., requires a person to directly inflict child abuse in order to violate the statute. The defendant contends that the legislature intended the statute to apply only to persons who directly abuse children. She maintains that the statute does not impose a duty on her to protect her own children from abuse. The state, however, argues that the statute is susceptible to an interpretation which includes persons having a special relationship to children who expose them to abuse. The state relies on the statutory language "subjects a child to cruel maltreatment." The state urges the court to construe this language to cover situations in which a parent knowingly exposes a child to abuse by placing the child in a situation where abuse has occurred and is likely to recur.

The threshold question when construing a statute is whether the statutory language is ambiguous. *State v. Wittrock,* 119 Wis. 2d 664, 669, 350 N.W. 2d 647 (1984). Statutory language is deemed ambiguous if reasonable persons could disagree as to its meaning. Therefore, the starting point for this court's interpretation of sec. 940.201, Stats., is the statutory language itself. The statute must be interpreted on the basis of the plain meaning of its terms. *Id.* at 670. Nontechnical words utilized in the statute must be given their ordinary and accepted meaning when not specifically defined and that meaning may be ascertained from a recognized dictionary. *Id.*

There is no statutory definition of "subjects" in sec. 940.201, Stats. We therefore turn to standard dictionary definitions for guidance. Webster's Third New In-

ternational Dictionary (1967) defines "subject" when used as a verb to mean: "a: to bring under control or dominion . . . b. to reduce to subservience or submission . . . 2a: to make liable . . . 4: to cause to undergo or submit to: make submit to a particular action or effect: expose." Funk and Wagnall's Standard Dictionary of the English Language International Edition (1960), similarly defines the verb "subject" to mean: "1. To bring under dominion or control; 2. To cause to undergo some experience or action . . . 4. To make liable; expose."

We conclude that the ordinary and accepted meaning of "subjects" does not limit the application of sec. 940.201, Stats., only to persons who actively participate in abusing children. The common meaning of "subjects" is broader than directly inflicting abuse on children. It covers situations in which a person with a duty toward a child exposes the child to a foreseeable risk of abuse.

Our interpretation of the scope of sec. 940.201, Stats., is consistent with the purpose of the statute. The statute operates to protect children from the consequences of conduct, without regard for any culpable mens rea on the part of the persons causing the consequences. In *State v. Danforth,* 129 Wis. 2d 187, 385 N.W.2d 125 (1986), this court expressly held that child abuse does not require criminal intent. This holding is consistent with *State v. Killory,* 73 Wis 2d 400, 413, 243 N.W. 2d 475 (1976), in which the court held that the crime of child abuse does not require malice. Thus, child abuse consists of subjecting a child to conduct which is "abhorrent to the sensitivities of the general public." *Id.* at 407. This is an objective standard rather than a subjective one. Applying this objective standard

249

of liability, we conclude that a person's conduct may subject a child to cruel maltreatment when the person exposes a child to a foreseeable risk of abhorrent conduct.

A person exposes a child to abuse when he or she causes the child to come within the influence of a foreseeable risk of cruel maltreatment. Causation in this context means that a person's conduct is a substantial factor in exposing the child to risk, and there may be more than one substantial causative factor in any given case. *See Hart v. State,* 75 Wis. 2d 371, 397, 249 N.W. 2d 810 (1977). In this case, Bert Williquette's conduct obviously was a direct cause of the abuse his children suffered. However, the defendant's alleged conduct, as the mother of the children, also was a contributing cause of risk to the children. She allegedly knew that the father abused the children in her absence, but she continued to leave the children and to entrust them to his exclusive care, and she allegedly did nothing else to prevent the abuse, such as notifying proper authorities or providing alternative child care in her absence. We conclude that the defendant's conduct, as alleged, constituted a substantial factor which increased the risk of further abuse.

The defendant disputes that an omission to act may constitute a crime. Although the court disagrees with this argument, we specifically note that the alleged conduct in this case involves more than an omission to act. The defendant regularly left the children in the father's exclusive care and control despite allegedly knowing that he abused the children in her absence. We consider leaving the children in these circumstances to be overt conduct. Therefore, even assuming that an overt act is necessary for the commis-

sion of a crime, the allegations support the charges in this case.

The court, however, also expressly rejects the defendant's claim that an act of commission, rather than omission, is a necessary element of a crime. The essence of criminal conduct is the requirement of a wrongful "act." LaFave and Scott, Criminal Law, sec. 25 at 177 (West 1972). This element, however, is satisfied by overt acts, as well as omissions to act where there is a legal duty to act. LaFave and Scott, Criminal Law sec. 26 at 182, states the general rule applicable to omissions:

> "Some statutory crimes are specifically defined in terms of omission to act. With other common law and statutory crimes which are defined in terms of conduct producing a specified result, a person may be criminally liable when his omission to act produces that result, but only if (1) he has, under the circumstances, a legal duty to act, and (2) he can physically perform the act. The trend of the law has been toward enlarging the scope of duty to act."

The comments to this section then state the traditional rule that a person generally has no duty to rescue or protect an endangered person unless a special relationship exists between the persons which imposes a legal duty to protect:

> "For criminal liability to be based upon a failure to act it must first be found that there is a duty to act—a legal duty and not simply a moral duty. As we have seen, some criminal statutes themselves impose the legal duty to act, as with the tax statute and the hit-and-run statute. With other crimes the duty must be found outside the definition of the

crime itself—perhaps in another statute, or in the common law, or in a contract.

"Generally one has no legal duty to aid another person in peril, even when that aid can be rendered without danger or inconvenience to himself. He need not shout a warning to a blind man headed for a precipice or to an absent-minded one walking into a gunpowder room with a lighted candle in hand. He need not pull a neighbor's baby out of a pool of water or rescue an unconscious person stretched across the railroad tracks, though the baby is drowning or the whistle of an approaching train is heard in the distance. A doctor is not legally bound to answer a desperate call from the frantic parents of a sick child, at least if it is not one of his regular patients. A moral duty to take affirmative action is not enough to impose a legal duty to do so. But there are situations which do give rise to a duty to act:

"(1) *Duty based upon relationship.* The common law imposes affirmative duties upon persons standing in certain personal relationships to other persons—upon parents to aid their small children, upon husbands to aid their wives, upon ship captains to aid their crews, upon masters to aid their servants. Thus a parent may be guilty of criminal homicide for failure to call a doctor for his sick child, a mother for failure to prevent the fatal beating of her baby by her lover, a husband for failure to aid his imperiled wife, a ship captain for failure to pick up a seaman or passenger fallen overboard, and an employer for failure to aid his endangered employee. Action may be required to thwart the threatened perils of nature (*e.g.,* to combat sickness, to ward off starvation or the elements); or it may be required to protect against threatened acts by third persons." LaFave and Scott, Criminal law at 183–84. (Footnotes omitted.)

252

The requirement of a legal duty to act is a policy limitation which prevents most omissions from being considered the proximate cause of a prohibited consequence. In a technical sense, a person's omission, *i.e.,* whether the person fails to protect, warn or rescue, may be a substantial factor in exposing another person to harm. The concept of causation, however, is not solely a question of mechanical connection between events, but also a question of policy. A particular legal cause must be one of which the law will take cognizance. *See State v. Serebin,* 119 Wis. 2d 837, 849, 350 N.W. 2d 65 (1984). The rule that persons do not have a general duty to protect represents a public policy choice to limit criminal liability.

The requirement of an overt act, therefore, is not inherently necessary for criminal liability. Criminal liability depends on conduct which is a substantial factor in producing consequences. Omissions are as capable of producing consequences as overt acts. Thus, the common law rule that there is no general duty to protect limits criminal liability where it would otherwise exist. The special relationship exception to the "no duty to act" rule represents a choice to retain liability for some omissions, which are considered morally unacceptable.

The defendant argues that imposing criminal liability for omissions is tantamount to creating a common law crime. She notes that sec. 939.10, Stats., specifically abolished common law crimes. Thus, she claims that the criminal code does require an overt act, regardless of whether an overt act otherwise is unnecessary for criminal liability.

Section 939.10, Stats., abolishes common law crimes, but it also states that "the common law rules of criminal law not in conflict with chs. 939 to 948 are

preserved." We conclude that the rule applicable to omissions does not define a substantive crime. Failure to act when there is a special relationship does not, by itself, constitute a crime. The failure must expose the dependent person to some proscribed result. The definition of proscribed results constitutes the substantive crime, and it is defined in the criminal code. The rule regarding omissions, therefore, is not inconsistent with chs. 939 to 948. [3]

Our conclusion is supported by persuasive authority. William A. Platz, formerly a Wisconsin Assistant Attorney General and the principal draftsman of the revised criminal code, construed the new code in an authoritative law review article, published contemporaneously with the code in 1956. Platz, *The Criminal Code,* 1956 Wis. L. Rev. 350. We consider such articles by the principal draftsman of a statutory enactment to be persuasive authority when construing a particular statute. *See State v. Alles,* 106 Wis. 2d 368, 386–87, 316 N.W. 2d 378 (1982). Platz specifically concluded that the rule regarding criminal liability for omissions was not abolished by sec. 939.10, Stats.:

> "But the common law *rules* of criminal law not inconsistent with the code are expressly preserved by sec. 939.10. This is because the code fails to state all the rules, such as the defense of insanity, *criminal liability for omissions,* and others. It is unfortunate and in part unnecessary that the code omits some of the rules of criminal law which could have been (and were in the 1953 draft) codified." *Id.* at 362.

---

[3] We also note that the defendant is herself relying on a common law rule when she argues that there is generally no duty to protect.

(Emphasis on "rules" in the original; other emphasis added; footnote omitted.)

The 1953 Legislative Council report on the proposed revision of the criminal code contained a section entitled "When Criminal Liability May Be Based on Omissions" (1953 Report, Vol. V at 7). This section was deleted from the final version of the 1955 code. Nonetheless, we agree with Platz that the rule regarding omissions was not abolished because it is not inconsistent with the criminal code.

We next address the scope of the "legal duty" exception to the rule regarding criminal liability for omissions. Like most jurisdictions, Wisconsin generally does not require a person to protect others from hazardous situations. *De Bauche v. Knott,* 69 Wis. 2d 119, 122–23, 230 N.W. 2d 158 (1975). When a special relationship exists between persons, however, social policy may impose a duty to protect. The relationship between a parent and a child exemplifies a special relationship where the duty to protect is imposed. We stated the rule applicable to the parent and child relationship in *Cole v. Sears, Roebuck & Co.,* 47 Wis. 2d 629, 634, 177 N.W. 2d 866 (1970):

> " 'It is the right and duty of parents under the law of nature as well as the common law and the statutes of many states to protect their children, to care for them in sickness and in health, and to do whatever may be necessary for their care, maintenance, and preservation, including medical attendance, if necessary. An omission to do this is a public wrong which the state, under its police powers, may prevent. The child has the right to call upon the parent for the discharge of this duty, and public policy for the good of society will not permit or allow the

255

parent to divest himself irrevocably of his obligations in this regard or to abandon them at his mere will or pleasure. . . .' 39 Am. Jur., *Parent and Child,* p. 669, sec. 46."

From the above discussion, we conclude that a parent who fails to take any action to stop instances of child abuse can be prosecuted as a principal for exposing the child to the abuse, contrary to sec. 940.201, Stats. Consistent with the common law rule, however, we do not hold that all persons, regardless of their relationship or lack of relationship to an abused child, violate the child abuse statute by failing to take remedial action to protect the child. Finally, when liability under sec. 940.201, depends on a breach of the parent's duty to protect, the parent must knowingly act in disregard of the facts giving rise to a duty to act. LaFave and Scott, Criminal Law, sec. 26 at 187. The "knowingly" requirement is necessary for a breach of the parent's duty to protect; it is not imposed as an element of sec. 940.201.

Other jurisdictions also have recognized that a parent can be prosecuted as a principal for a knowing failure to protect. *See* Annot., "Penal Statutes Prohibiting Child Abuse," 1 A.L.R. 4th 38, sec. 21 (1980). The Maryland courts provide the most useful analysis of the issue in a context involving a statute similar to sec. 940.201, Stats. In *State v. Fabritz,* 276 Md. 416, 348 A. 2d 275, 280 (1975), the Maryland Court of Appeals construed that state's child abuse statute to apply to a parent who allegedly caused a child to experience further injury because she failed to seek prompt medical attention for the child who had been severely beaten by a baby sitter. The Maryland statute under which Fabritz was convicted provided that any parent or other person

having custody of a child under 18 who causes abuse to such minor child is guilty of a felony. The statute defined "abuse" as "any physical injury or injuries sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts." *Id.* at 423. In *Fabritz,* the mother did not strike the blows which caused the initial injuries to the child nor did she know that the person in whose custody she had left her daughter would abuse the girl. Nevertheless, the court upheld the mother's conviction because the evidence showed that her failure to obtain prompt medical attention for the child resulted in further physical injury to the child.[4] In this case, the language of sec. 940.201 is more expansive than the wording of the Maryland statute at issue in *Fabritz.* The Maryland statute penalized specified persons for "caus[ing] abuse" to a minor child, whereas sec. 940.201, makes it a crime to "subject a child to cruel maltreatment."

In *Pope v. State,* 284 Md. 309, 396 A. 2d 1054 (1979), the Maryland Court of Appeals reaffirmed its conclusion that a parent who fails to prevent numerous acts of abuse to a child over a relatively protracted period may be guilty of felony child abuse. Pope's child abuse conviction was reversed because her status as a friend of the abusive mother did not bring her within the class of persons specified by the statute; however, the court declared that Pope's failure to attempt to stop the abuse brought her conduct within the purview of the Maryland law.

---

[4] Although Fabritz's conviction was reversed on habeas corpus in *Fabritz v. Traurig,* 583 F. 2d (4th Cir. 1978), the basis for the reversal was insufficient evidence to show that the defendant knew the extent of her daughter's injuries or the foreseeable consequences of her failure to obtain prompt medical attention.

A prior Maryland decision, although not involving a conviction under a child abuse statute, also is particularly relevant to this defendant's claim that an omission cannot constitute a crime. In *Palmer v. State*, 223 Md. 341, 164 A. 2d 467 (1960), a mother was convicted of negligent homicide based on her failure to protect her child from the repeated abuse of her lover. The Maryland Court of Appeals succinctly stated the basis for the mother's criminal liability:

"There seems to be no doubt that the direct and immediate cause of Terry's death was the violent blow or blows inflicted upon her by McCue on September 3rd. But we do not deem this action upon his part to amount to an 'intervening efficient cause' (as distinguished from one that is concurrent or contributing), as that term is used in the statement of the doctrine of proximate cause. McCue's brutal striking of the child so as to cause her death would constitute a ground of defense for the appellant's gross negligence only if it were the sole cause of the injury. . . . In 1 Wharton, Criminal Law and Procedure (Anderson), Section 68, the learned author states: 'A person is only criminally liable for what he has caused, that is, there must be a causal relationship between his act and the harm sustained for which he is prosecuted. It is not essential to the existence of a causal relationship that the ultimate harm which has resulted was foreseen or intended by the actor. It is sufficient that the ultimate harm is one which a reasonable man would foresee as being reasonably related to the acts of the defendant. . . . To constitute the cause of the harm, it is not necessary that the defendant's act be the sole reason for the realization of the harm which has been sustained by the victim. The defendant does not cease to be responsible for his otherwise

criminal conduct because there were other conditions which contributed to the same result.' We pointed out above that McCue's violent and unrestrained actions were of such a nature as to put any ordinary, reasonable person on notice that the child's life was truly and realistically in immediate peril. The appellant easily could, and should, have removed Terry from this danger. Her failure to do so, under the circumstances previously described, is sufficient, as indicated before, to support a finding by the trial judge that her gross and criminal negligence was a contributing cause of Terry's unfortunate death." *Id.* at 352–53.

*See also State v. Adams,* 89 N.M. Ct. App. 737, 557 P. 2d 586, 587 (1976), in which the New Mexico Court of Appeals affirmed a negligent homicide conviction based on a father's knowing failure to protect his child from the abuse of the child's mother.

The defendant next argues that the legislature did not intend sec. 940.201, Stats., to apply to a parent's failure to protect her children because a parent does not even have a duty to report child abuse. Section 48.981(2), [5] requires specified professionals to report

---

[5] Section 48.981(2), Stats., provides as follows:

"(2)   PERSONS REQUIRED TO REPORT CASES OF SUSPECTED CHILD ABUSE OR NEGLECT. A physician, coroner, medical examiner, nurse, dentist, chiropractor, optometrist, other medical or mental health professional, social or public assistance worker, school teacher, administrator or counselor, child care worker in a day care center or child caring institution, day care provider, alcohol or other drug abuse counselor, member of the treatment staff employed by or working under contract with a board established under s. 46.23, 51.42 or 51.437, physical therapist, occupational therapist, speech therapist, emergency medical technician—advanced

cases of suspected child abuse or neglect. Parents are not enumerated as having such a statutory duty.

We are unpersuaded that the child abuse reporting statute was intended to relieve parents of their common law duty to protect their children. We construe the statute as creating duties for persons who otherwise had no obligation to protect children because they do not have a recognized special relationship with the child. The creation of duties where none previously existed, however, cannot be construed to relieve parents of their common law duty to their children. Also, the fact that the reporting statute only imposes a duty to report abuse does not mean that a parent's duty is similarly limited. A broader parental duty is indicated by sec. 48.02(12), Stats., which defines "legal custody" to include the duty to protect a child. Thus, we conclude that the reporting statute does not affect our analysis of a parent's criminal liability for failing to protect a child.

The enactment of sec. 940.34, Stats.,[6] subsequent

---

(paramedic), ambulance attendant or police law enforcement officer having reasonable cause to suspect that a child seen in the course of professional duties has been abused or neglected or having reason to believe that a child seen in the course of professional duties has been threatened with an injury and that abuse of the child will occur shall report as provided in sub. (3). Any other person including an attorney having reason to suspect that a child has been abused or neglected or reason to believe that a child has been threatened with an injury and that abuse of the child will occur may make such a report. No person making a report under this subsection may be discharged from employment for so doing."

[6] Section 940.34, Stats., provides as follows:

" **940.34 Duty to aid endangered crime victim.** (1) Whoever violates sub. (2) is guilty of a Class C misdemeanor.

260

to the commencement of this prosecution also does not indicate that the defendant was previously immune from criminal liability for her conduct. Section 940.34 is a "Good Samaritan" law which imposes criminal liability on "[a]ny person who knows that a crime is being committed and that a victim is exposed to bodily harm" but fails to summon help or provide assistance to the victim. The new statute does not deny the prior existence of a parent's duty to protect. We acknowledge that a parent now could be charged under either statute. Section 939.65, however, provides that if an act forms the basis for a crime punishable under more than one statutory provision, then the state can prosecute under any or all such provisions.

Finally, we reject the defendant's claim that sec. 940.201, Stats., is unconstitutionally vague if it is construed to apply to a parent's knowing failure to protect a child from abuse. In *Killory,* 73 Wis. 2d at 407, we defined "cruel maltreatment" to refer to acts which are "abhorrent to the sensitivities of the general public,"

---

" (2) Any person who knows that a crime is being committed and that a victim is exposed to bodily harm shall summon law enforcement officers or other assistance or shall provide assistance to the victim. A person need not comply with this subsection if any of the following apply:

" (a) Compliance would place him or her in danger.

" (b) Compliance would interfere with duties the person owes to others.

" (c) Assistance is being summoned or provided by others.

" (3) If a person renders emergency care for a victim, s. 895.48 applies. Any person who provides other reasonable assistance under this section is immune from civil liability for his or her acts or omissions in providing the assistance. This immunity does not apply if the person receives or expects to receive compensation for providing the assistance."

and we held that this standard is sufficiently definite to give notice of what is prohibited. Our holding in this case is that a parent who knowingly exposes a child to the risk of such abhorrent conduct violates the statute. This construction of sec. 940.201 gives the defendant notice that she has an affirmative duty to protect her children from a foreseeable risk of cruel maltreatment. The statute is not unconstitutionally vague.

We conclude that the defendant's alleged conduct is within the prohibitions of sec. 940.201, Stats. The statute prohibits persons from exposing or subjecting a child to a foreseeable risk of cruel maltreatment. The evidence at the defendant's preliminary hearing indicates that she left her children in the exclusive care of her husband despite allegedly knowing that he regularly abused the children in her absence. She allegedly did nothing to protect the children from such abuse, including at least reporting the husband's conduct to proper authorities. This evidence is sufficient to find probable cause that the defendant exposed the children to the risk of continuing and further abuse, thereby requiring that she be bound over for trial.

*By the Court.*—The decision of the court of appeals is affirmed.

BABLITCH, J.   *(concurring).* The State of Wisconsin (State) alleges that Terri Williquette (Williquette) left her two children in the care of her husband on numerous occasions, and that her children told her about his abuse on these numerous occasions. She continued to leave them with her husband otherwise unattended; they continued to be abused. I agree with the court of appeals that this conduct, if proved, constitutes aiding and abetting the crime of child abuse.

262

Under sec. 939.05(2)(b), Stats., the elements of aiding and abetting are: (1) the defendant undertook conduct that as a matter of objective fact aided another in the execution of a crime; and (2) the defendant consciously desired or intended that his conduct would yield such assistance. *State v. Hecht,* 116 Wis. 2d 605, 619–20, 342 N.W. 2d 721 (1984).

A reasonable jury could find from the fact that Williquette's conduct in continuing to leave her children in the care of her husband, notwithstanding the children's recitations of abuse, as a matter of objective fact aided in the abuse of the children and that she consciously desired or intended that her conduct would yield such assistance.

I do not join the majority opinion, because I do not agree that the language of the statute, given these alleged facts, allows the State to charge Williquette as a direct actor, pursuant to sec. 940.201, Stats. I agree with the dissent that the statute requires a direct nexus between the act and the injury, which is not present here. The State does not allege that Williquette was the direct actor; it concedes that her husband was the person who directly caused injury to the children.

Because I conclude that Williquette can be prosecuted for aiding and abetting this crime, I cannot join the dissent, but rather concur with the majority's affirmance of the decision of the court of appeals.

HEFFERNAN, CHIEF JUSTICE *(dissenting).* The majority of the court has decided that the neglectful conduct of the defendant is to be proscribed by the criminal law. Such action by a legislature may well be commendable, but by a court condemnable. I dissent.

Even the prosecution acknowledges that whether the conduct of the defendant fits the legislative definition of a criminal act can only be answered with hesitancy and doubt. The state acknowledges that, with respect to Terri Williquette, the statute is ambiguous. Thus, at the very outset of the state's analysis, there is the express admission that it is not clear that Terri Williquette is within the ambit of the statute. The state acknowledges that "reasonably well-informed persons could disagree over whether the defendant's conduct constituted subjecting her children to cruel maltreatment under sec. 940.201, Stats."

The state then inconsistently goes on to argue—and its argument is accepted by the majority—that it really is clear that the statute not only prohibits conduct by which an actor directly and personally inflicted cruel maltreatment upon a child, but also proscribes all conduct by a person, not the inflicter of torture or maltreatment, which permits the prohibited conduct to take place if there is knowledge that the abusive conduct will take place.

What is clear is that the conduct of the father—he has been convicted—is indeed loathsome, disgusting, and, to use the language of the majority, " 'abhorrent to the sensitivities of the general public.' " (P. 249.) To apply that latter verbiage to Terri's conduct, however, is to equate very unlike acts.

This, however, is a criminal case, not an occasion for an emotional cathartic nor for this court's exercise of righteous indignation. The question for a court is whether the legislature has made criminal the action with which Terri Williquette has been charged. The question is not whether a court, were it sitting as a legislature, would have proscribed the conduct. Most egre-

giously, although it points to no legislative intent contemporaneous with the passage of the law that would make Terri Williquette's conduct a felony, the majority finds that the statute means that conduct which occurred almost three years ago is now to be definitively declared criminal. In the absence of some indicia supporting that interpretation stemming from the time of the law's passage, the best that can be said of the law which the majority now promulgates, assuming it is otherwise appropriate, is that it is unconstitutional as *ex post facto.*

Putting aside for the nonce that the consideration that this court has acted as a legislature to impose sanctions after the fact, let us consider the logical and semantic underpinnings of the opinion supporting the position of the state.

Just the examination of the language of the statute dispels any argument supportive of the state's position:

" **940.201    Abuse of Children.** Whoever tortures a child or subjects a child to cruel maltreatment, including, but not limited, to severe bruising, lacerations, fractured bones, burns, internal injuries or any injury constituting great bodily harm under s. 939.22 (14), is guilty of a class E Felony.
. . ."

It is rather clear that a person of normal comprehension at first blush would have no problem in concluding that the actor whose conduct is to be sanctioned by the state is he or she who actually tortures a child or subjects the child to cruel maltreatment—the person who inflicts the harm.

The majority, following the convoluted reasoning of the state, relies upon the language, "subjects a child,"

265

as the verbal touchstone that exposes a non-first-person actor to liability under the statute. This rationalization was, I believe, effectively dispelled as faulty by the court of appeals when it stated:

> "The state reads too much into the use of the verb 'subjects' in sec. 940.201. Interpreting the statute as the state urges, a person would not be liable for permitting torture to a child because 'subjects' is not used in conjunction with the prohibition against torture. No logic justifies differentiating between the bases of liability for torture and cruel maltreatment." 125 Wis. 2d 86, 88, 370 NW.2d 282 (Ct. App. 1985).

The state would justify its illogical interpretation on the premise that torture and cruel maltreatment are at least partially overlapping synonyms and thus "torture" is a superfluous word. That course of argument violates one of the fundamental canons of statutory interpretation—that all words are to be given equal weight. The state's argument is, of course, an understandable, if not justifiable, one for the prosecution to make, but the fact that the state finds it necessary to make the argument exemplifies the statute's lack of clarity when applied to the instant situation and the desperate scrambling of the state to find a legislative intent to define as a felony Terri Williquette's conduct, when it is clear the legislature had no such conduct in mind.

That it did not have such conduct in mind is shown by the legislative history. The amendment to the statute in 1968 was apparently induced by the instructions of the speaker of the assembly, George Molinaro. The original draft bill, 1969 Bill 544A, provided:

"Whoever ~~intentionally~~ tortures, ~~torments~~ or subjects to ~~physical abuse or~~ cruel maltreatment any child may be fined. ..." (The struck-through words have been subsequently deleted although they appeared in the original draft.)

This draft makes it rather clear that the language "subjects to" was parallel in legislative intent to "tortures," *i.e.,* it spoke to the conduct of the principal actor.

The real intent of the original bill revealed by the drafting file was to eliminate "intent" in the sense of "intent to torture" or "intent to maltreat" as an element of the crime. The bill jacket shows that "intentionally" was stricken from the 1969 draft to protect "youngsters who are helpless victims of a father who 'didn't mean to hit him so hard,' or the mother who feels it is her 'duty to beat the children' to instill discipline."[1]

Thus, if one is to accept the position of the state, and I for one would not, that the legislation is ambiguous, the ambiguity is resolved by the clear demonstration that what the drafters intended was that the principal actor be criminally liable even though there was no subjective intent to torture or maltreat. The record is devoid of any material that implies a legislative intent that any person was to be held liable as a principal in a felony action for allowing a child to remain, or to be placed, in a situation where he or she might be abused.

To conclude that such was the intent of the legislature is to attribute to it—and to its staff—a complete lack of drafting expertise and the ordinary usages of

---

[1] Bill file letter dated April 20, 1968, from *Kenosha News* to Assemblyman George Molinaro.

the English language. Other jurisdictions have stated specifically in their child abuse statutes that a person not the principal actor or abuser could be liable as the principal when a child was knowingly placed in a circumstance where abuse could occur.[2] I believe that were that the intent of the Wisconsin legislature, the statutory language demonstrates it did not have the ability to make that intent clear. I, however, do not consider that implied conclusion an appropriate one for this court to reach. We denigrate the legislature or, alternatively, we, as a court, are invading an area of the law—the proscription of criminal conduct—which is wholly statutory and is beyond the reach of a court's common law or inherent powers. Clearly, the majority's strained interpretation is an invasion of the legislative prerogative.

[2] *See, e.g.,* Colorado Statutes, sec. 18–6–401(1) ("A person commits child abuse if he causes an injury to a child's life or health or permits a child to be unreasonably placed in a situation which poses a threat of injury to the child's life or health."), Florida Statutes (1985), sec. 827.04(1) ("Whoever, willfully or by culpable negligence, deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment, or who, knowingly or by culpable negligence, permits physical or mental injury to the child, and in so doing causes great bodily harm, permanent disability, or permanent disfigurement to such child, shall be guilty of a felony of the third degree . . ."); Nevada Statutes (1983–84), sec. 200.508 ("1. Any adult person who willfully causes or permits a child who is less than 18 years of age to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or who willfully causes or permits a child to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect is guilty of . . .; 2. . . .; 3. As used in this section, 'permit' means permission that a reasonable person would not grant and which amounts to a neglect of responsibility attending the care, custody and control of a minor child.")

The majority correctly asserts the criminal conduct can be predicated upon the failure to act when action is required by law. The problem is that nothing in the statutes remotely suggests that a parent has the legislatively prescribed legal duty to act in the instant circumstances or that the omission of the alleged duty will result in criminal sanctions. Certainly, I agree with the majority who, after reciting the catalog of horrors perpetrated upon these children, asserts, citing *Cole v. Sears, Roebuck & Co.,* 47 Wis. 2d 629, 634, 177 N.W. 2d 866 (1970):

> "An omission to do this [care for and protect children] is a public wrong which the state, under its police powers, may prevent." (P. 255.)

The problem with this position is that it begs the question. Of course, the state has the police powers which may be exercised for that very purpose. The omission can be categorized as a public wrong which the legislature *may* prevent. But the police power is a power of the legislature. It is not an independent power conferred upon courts. Courts may validate a legislature's conduct by recognizing the legislature's police power, but courts cannot supply that exercise of power where there is no evidence that the legislature so intended to act.

We return to the fundamental defect in the position of the state. There is no evidence that the legislature intended to exercise its police power in the manner urged here. I reiterate, if it desired to do so, the appropriate statutory language was not beyond the capabilities of the legislature.

The Maryland cases upon which the majority relies are inapposite, for the statutes there considered re-

269

flect a different and expressly stated legislative intent. In *State v. Fabritz,* 276 Md. 416, 348 A. 2d 275 (1975), *cert. denied* 425 U.S. 942 (1976), and *Pope v. State,* 284 Md. 309, 396 A. 2d 1054 (1979), the Maryland court did find that their statute permitted prosecution of a parent in particular circumstances for a knowing failure to protect a child from abuse.

The Maryland statute, Md. Code Art. 27, sec. 35A, however, differed significantly from the Wisconsin one. The language of that statute provided:

> " 'Any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child under the age of eighteen years who causes abuse to such minor child shall be guilty of a felony. . . .' " *Pope, supra* at 321.

Abuse was defined as including " 'injuries sustained by a child as a result of cruel or inhumane treatment.' " *Pope, supra* at 318.

In *State v. Fabritz, supra,* the Maryland court upheld the conviction of the mother because she failed to obtain medical treatment for her severely beaten child. There was indeed no evidence that Fabritz (the mother) had struck the blows nor evidence that Fabritz had any inkling that the person in whose custody she had left the child would maltreat her. There was evidence, however, that, knowing of the injuries, the mother had failed to obtain prompt medical attention and that such neglect "caused" abuse which was further physical injury. It is apparent that the *Fabritz* rationale is not transferable to the present case, for it depends upon the precise and disparate wording of the Maryland statute. While this writer has no quarrel with the state's argument that the conduct in the instant case

may be just as "egregious" as Fabritz's failure to obtain medical treatment, that fact is irrelevant if the statute in Wisconsin is inapplicable to the present facts. We are not, at this juncture concerned with the relative degree of misconduct, but only with the certitude with which the statute denominates the conduct as criminal.

The *Fabritz* holding is further explained in *Pope, supra* at 319:

> "We found that the failure of the mother to seek or obtain any medical assistance for her child, although the need therefor was obviously compelling and urgent, caused the child to sustain bodily injury additional to and beyond that inflicted upon the child by reason of the original assault by another. The act of omission by the mother 'constituted a cause of the further progression and worsening of the injuries which led to [the child's] death; and that in these circumstances [the mother's] treatment of [the child] was "cruel and inhumane" within the meaning of the statute. . . .' *Id.* at 425–426."

*Pope v. State* also arose out of the failure to obtain medical help for a battered baby. The court of appeals of Maryland affirmed the dismissal of the charge of child abuse, not because the complaint was substantively deficient, but because the defendant was not within the class of persons subject to prosecution. The *Pope* court pointed out that:

> "In *Fabritz* we went no farther than to determine that the Legislature intended that the 'cause' of an injury may include an act of omission so as to constitute cruel or inhumane treatment, in that case the failure of the mother to seek or obtain medical assistance for her child who had been abused

271

by another. *Fabritz* did not go to the class of persons to whom the statutory proscription applies, as the accused there was a 'parent,' the victim's mother, expressly designated in the statute." *Pope, supra* at 320.

*Pope* involved a person who was a bystander at the time of the child's fatal and orgiastic pummeling by the mother and who failed to seek medical assistance for the child. The child abuse case against her was dismissed because she was not a person specifically named as the target of the child abuse statute's proscription, *i.e.,* she was not a " 'parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child under the age of eighteen years.' " *Pope, supra* at 321.

It is clear, however, that were Pope within the class targeted by the statute, her conduct was proscribed as child abuse, for the court found that Pope's inaction could constitute "a cause of the further progression and worsening of the injuries which led to [the child's] death." *Pope, supra* at 319.

In these Maryland cases, where the evidence showed that the failure to provide medical assistance resulted in a worsening condition, the neglect *caused* abuse as defined in the statute. The Maryland court's holding that the omission to supply treatment was abuse falls squarely within the statute applicable there. That rationale is simply not applicable in Wisconsin, where the obvious meaning of "tortures a child or subjects a child to cruel maltreatment" requires an overt act and not a mere failure to act, as in the present circumstances.

Although the majority cites the Maryland cases as precedent, what should be the lesson of those cases is ignored. The Maryland court carefully avoided construing the statute to include persons who were not clearly the target for the legislature's concern. Although by less stretching of the imagination than used by the majority in the present case, it would be possible to conclude that Pope might have been a person of the class targeted by the Maryland legislature for the proscriptions of the child abuse law.

The majority concludes that the reach of the statute is precise—not vague—because we have, in *State v. Killory,* 73 Wis. 2d 400, 407, 243 N.W. 2d 475 (1976), defined "cruel maltreatment" as acts that are "abhorrent to the sensitivities of the general public." Granting that the particular affirmative acts of the father recited by the majority are "abhorrent to the sensitivities of the general public," the mother's failure to remove the children from their father's care does not easily fit that description. Particularly, I reach this conclusion when the state acknowledges that "reasonably well-informed persons could disagree over whether the defendant's conduct constituted subjecting her children to cruel maltreatment under sec. 940.201, Stats."

Even if we are to assume, as does the majority decision, that the statute clearly means to a lay person what it means to this court after *Killory,* 73 Wis. 2d at 407—that the dominant general purpose of sec. 940.201 is to protect children from conduct abhorrent to the sensitivities of the general public—it is far from clear that this is a legislative declaration that a mother who leaves her children with the other parent—even if she knows of his brutal propensities—is to be considered a felon and guilty of the same felony of which he

is guilty. There are numerous adjectives that could be applied to the mother's conduct, all of which would connote a high degree of opprobrium, but the question is not whether the court castigates the mother for her conduct but whether the statute gave notice that her conduct was proscribed by the criminal law.

In *Killory,* we stated that a statute was constitutionally vague "[i]f the statute is so obscure that men of common intelligence must necessarily guess at its meaning and differ as to its applicability. . . ." P. 405.

This statute is not sufficiently definite to give reasonable notice to a parent that the failure to act falls within the prohibited conduct of the statute. Clearly, the state and the majority of this court arrive at their conclusion only by straining reason to its outer limits. The majority opinion speaks for itself in demonstrating that the court has "guessed" at the meaning of the statute. It is apparent that none of the participants in this unfortunate episode, nor the prosecution and the court, could have looked at the statute and have said with any degree of confidence that Terri Williquette's conduct would constitute the felonious act of torturing a child or submitting it to cruel maltreatment. The only thing clearly revealed by a perusal of the statute is vagueness in its application to the present facts.

We have correctly, I believe, concluded that there need be no intent to torture, no intent to maltreat. (*See, State v. Danforth,* 129 Wis. 2d 187, 385 N.W.2d 125 (1986).) Hence, the statute comes perilously close to a strict liability statute. I have no quarrel with such an application of the law provided the child abuse statute is applied only in those cases where the legislature has given clear notice of its applicability. To insist on less sanctions the denial of due process.

One real problem revealed here is that the court does not have the investigative facilities to decide what ought to be done in a broad spectrum of cases involving child abuse. We do not have the legislature's fact-finding process to justify our determination of what the criminal law should be. We are assuming, without being sure, that the legislature, had it confronted the problem posed here, would have concluded, as the majority guesses it would have concluded, that the conduct of Terri Williquette was just as culpable as that of her husband, who was overtly and cruelly sodomizing and torturing the children. While that assumption could be correct, it is not an assumption that a court should make. We do not know how the legislature would have treated the present facts. Nor do we have the authority as a court to reach that conclusion. We are not the branch of the government that has been designated by the constitution to determine what conduct is criminal. Yet, in this case, we come forward withour own definition of criminality. While to do so may give the proponents of this court-made legislation a self-satisfied glow of rectitude, in reality we are by this opinion usurping the legislative prerogative to make the criminal law. While we have responsibilities in the formulation of the common law, the wise sages of our jurisprudence have long recognized that, unless conduct is clearly and unequivocally declared to be criminal by the legislature, a court should restrain itself—even from the impulse to do what it believes to be morally justified.

*Pope, supra,* has been quoted by the majority for an inapplicable proposition. I suggest that it would more appropriately be quoted for its admonition to judicial restraint:

275

"[T]he culpability for her conduct during the abuse of the child must be determined strictly within the law or else the basic tenets of our system of justice are prostituted. There is an understandable feeling of outrage at what occurred. . . . But it is the law, not indignation, which governs." *Pope,* at 333.

I dissent.

I am authorized to state that JUSTICE ABRAHAMSON joins in this dissent.